1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                      --oOo--

4   In Re:                    )  Case No. LA08-32349-BR
                              )
5   EZRI NAMVAR,              )  Los Angeles, California
                              )  Wednesday, October 27, 2010
6           Debtor.           )  10:00 a.m.
    _____)

7
                                 ADV. 09-01591 AFRA V. NAMVAR
8                                ET AL

9                                TRIAL RE COMPLAINT FOR
                                 NONDISCHARGEABILITY OF DEBT
10                               PURSUANT TO 11 U.S.C. SECTION
                                 523(A)(2)(A)
11                               NONDISCHARGEABILITY OF DEBT
                                 PURSUANT TO 11 U.S.C. SECTION
12                               523(A)(6)

13                 TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE BARRY RUSSELL
14               UNITED STATES BANKRUPTCY JUDGE

15  APPEARANCES:

16  For the Plaintiff:          SAUL REISS, ESQ.
                                Law Offices of Saul Reiss
17                              2800 28th Street
                                Suite 328
18                              Santa Monica, California 90405
                                (310) 450-2888
19

20  For the Defendant:          STEPHEN F. BIEGENZAHN, ESQ.
                                Law Offices of Stephen F.
21                                Biegenzahn
                                4300 Via Marisol, Suite 764
22                              Los Angeles, California 90042
                                (213) 617-0017
23


24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

ii

```
 1  Court Recorder:              Oscar Flores
                                 United States Bankruptcy Court
 2                               Edward R. Roybal Federal
                                    Building
 3                               255 East Temple Street
                                 Los Angeles, California 90012
 4                               (213) 894-7202

 5  Transcriber:                 Briggs Reporting Company, Inc.
                                 6336 Greenwich Drive, Suite B
 6                               San Diego, California 92122
                                 (310) 410-4151
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

iii

## I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Farid Afra | -- | 12 | 49 | -- |
| Ezri Namvar | -- | 53 | 67 | -- |

*Briggs Reporting Company, Inc.*

1

1   LOS ANGELES, CALIFORNIA WEDNESDAY, OCTOBER 27, 2010 10:00 AM

2                              --oOo--

3        (Call to order of the Court.)

4            THE CLERK:  Number one, Namvar.

5            MR. REISS:  Good morning, your Honor.  Saul Reiss

6   on behalf of the Plaintiff, the Afra Pension Trust.

7            THE COURT:  Okay.

8            MR. REISS:   Present in court is Doctor Farid Afra.

9            THE COURT:  Okay.

10           MR. BIEGENZAHN:  Good morning, your Honor.  Steve

11  Biegenzahn, counsel for the Debtor and Defendant, Mr.

12  Namvar, who is present in the courtroom.

13           THE COURT:  Okay.  Why don't we get started.  By

14  the way, there seems to be a little -- I don't know if

15  confusion would be the right word about the procedures for

16  this trial.  I thought it was fairly clear.  In fact, when

17  we -- when I set the various dates of things, I do it in

18  court so everybody was here.  I know, Mr. Biegenzahn, I know

19  you were here.  Mr. Reiss, you were here.  So I was just a

20  little confused and surprised by the -- apparently some

21  questions about how to proceed.

22           For instance -- Mr. Biegenzahn, why don't you come

23  to the podium, if you would.  You made some -- some

24  objections which, quite frankly, I don't understand.  One

25  I've never seen before is wanting to strike portions of a

2

1 brief.  Where do you -- where do you get that from?  I

2 understand declarations.  You can certainly argue it, but

3 I've never seen anything like that.  Where did you get the

4 idea you could do that?

5          MR. BIEGENZAHN:  Your Honor, it just seemed to me

6 to be appropriate.

7          THE COURT:  Okay.  Well --

8          MR. BIEGENZAHN:  There was --

9          THE COURT:  I wouldn't do that in the future.

10 There is no such thing.  If you disagree, it's just

11 argument.  That's not appropriate.  And also you had some

12 question which, again, I don't understand.  You had

13 improperly filed a reply that you said no -- I guess two

14 wrongs don't make a right or something like that.  What were

15 you doing?  You filed a reply which is not authorized under

16 the rule, but you said but Mr. Reiss had done something

17 wrong.  Also, therefore, it was right.

18          That's kind of an odd way of proceeding.  Could

19 you explain that, your thought process?

20          MR. BIEGENZAHN:  Well, your Honor, the Court had

21 issued its trial procedures order.

22          THE COURT:  I have that right in front of me,

23 right.

24          MR. BIEGENZAHN:  And in that trial procedures

25 order, it provided the Plaintiff the opportunity to respond

3

1  to evidence but not to rebrief the issue.

2        THE COURT:  No, that's not true at all.  You just

3  didn't read the -- you haven't read the order, of course.

4  In fact, I explained the entire procedure at the bottom,

5  time for briefs:

6        "If a party wishes to file a trial brief

7        or briefs, such brief or briefs must be

8        filed with the parties' declarations."

9        Okay.

10        MR. BIEGENZAHN:  Yes.

11        THE COURT:  So the Plaintiff -- you're saying that

12 they had no right to file reply declarations?

13        MR. BIEGENZAHN:  That's -- that's how I read the

14 order, your Honor.

15        THE COURT:  Well, I'm not sure how you possibly

16 could read it, but let's read it together.  I have it in

17 front of me.  It says:

18        "First, Plaintiff shall file

19        declarations on or before a certain

20        date."

21        And then we get to the next item.  You filed your

22 declarations, and then (c):

23        "Plaintiff shall serve and file its

24        reply declarations."

25        MR. BIEGENZAHN:  Reply declarations.

4

1          THE COURT:  Yes.

2          MR. BIEGENZAHN:  But not more briefs and argument.

3 I thought --

4          THE COURT:  Well, that's very interesting because

5 this is not a complicated order.  That's (c), you file the

6 reply declarations and any evidentiary objections.  Then I

7 just read you just a minute ago -- I'll read it again:

8          "Time for filing briefs.  If a party

9          wishes to file a brief or briefs, such

10          brief or briefs must be filed with the

11          parties' declarations."

12          Well, reply declarations, brief, get it now?

13          MR. BIEGENZAHN:  Well, I understand what you're

14 trying to tell me.  That wasn't at all clear to me from the

15 order.

16          THE COURT:  Again, I say, it's plain English.  So

17 I'll leave it at that.  It says that briefs shall be filed,

18 if you're going to file a brief, with your declarations, and

19 obviously reply declarations would have a reply brief.

20          Well, what part of that don't you understand?

21          MR. BIEGENZAHN:  I'm sorry, your Honor.  I didn't

22 read it that way.  I read it to mean that there could be

23 responses that they were limited categorically and that they

24 didn't include further argument.  That's the reason I wrote

25 what I wrote.

5

1          THE COURT:  Well, I hear what you're saying, and I

2   accept what you're saying, but I've never heard anybody say

3   that before.

4          MR. BIEGENZAHN:  Well, I'm sorry for being new,

5   different, and creative.

6          THE COURT:  Well, but also -- it was something

7   also -- this was -- I wouldn't call it a comedy of errors

8   because it's a serious matter, but on number (b) it says --

9   you say I didn't intend to set September 1st as the date.

10  Well, yes, I did intend it.  However, when I looked at my

11  calendar -- and that is the date I intended.  But what I

12  normally do, and you're quite correct, is have two weeks

13  between them.  You were here in court when I said that.

14  Every now and then, believe it or not, judges make mistakes,

15  and so, although I normally do two weeks, I looked at the

16  calendar, and you should have corrected it at that point.

17          What concerns me is even though you were -- and

18  I'm not going to do anything about it now.  But what you

19  should have done at some point, obviously you didn't realize

20  it in court.  I certainly didn't.  At some point you

21  realized that was probably a mistake.  Rather than just

22  unilaterally say, oh, that's -- I know that's a mistake,

23  guess what, this is a court order.  What you needed to do

24  was either get a stipulation or send in something to make

25  sure that I do it.  It's not a wise thing to simply ignore

6

1 the order.

2 　　　　MR. BIEGENZAHN:  I didn't think I was, your Honor.

3 The copy that I had was difficult to read.  So I looked at

4 the other two pretrial orders that you had issued in the

5 other two adversary proceedings.

6 　　　　THE COURT:  I understand.  I don't want to belabor

7 it.  I mean, you are correct that that's what I -- I

8 normally would do.  I made an error, but hopefully that's

9 why I do these things in court.  But the reason I mentioned

10 it is -- anyway, I would -- I've never had this happen

11 before.  It won't happen again.  In fact, we have I know a

12 trial next week, but I understand from my clerk that that's

13 been settled.

14 　　　　THE CLERK:  Yes, your Honor.

15 　　　　THE COURT:  I just took it with me so I could read

16 it over the weekend, but I -- anyway, so thank you.  I don't

17 have to read it now, but, anyway, having said all that, you

18 ready to proceed?

19 　　　　MR. BIEGENZAHN:  I'm ready to proceed, your Honor.

20 　　　　THE COURT:  Okay.  And do you have any witnesses

21 here?

22 　　　　MR. BIEGENZAHN:  Your Honor, I represent the

23 Defendant.

24 　　　　THE COURT:  No.  I meant you all.  I'm not from

25 the south, but I --

7

1          MR. BIEGENZAHN:  Oh.

2          THE COURT:  I didn't mean just you.

3          MR. BIEGENZAHN:  We have the parties.

4          THE COURT:  I can see that.

5          MR. BIEGENZAHN:  And I think -- I think that's

6  what we have.  We have argument, and we have the parties.

7          THE COURT:  Well, there are other declarations.

8          MR. BIEGENZAHN:  Beg your pardon?

9          THE COURT:  There were other declarations.

10          MR. BIEGENZAHN:  I didn't -- based on my

11  discussions with Mr. Reiss, I thought he didn't want to

12  cross examine the two witnesses who testified.

13          THE COURT:  Well, you had two declarations.  It's

14  a simple question.  I don't --

15          MR. BIEGENZAHN:  Those -- your Honor, I put those

16  witnesses on call.  I --

17          THE COURT:  Why would you do that?  What authority

18  do --

19          MR. BIEGENZAHN:  Because they're both lawyers.

20  They both have practices, and I didn't think they should be

21  forced to sit through what might be hours of an adversary

22  proceeding.

23          THE COURT:  I guess you haven't tried many cases

24  recently, but I -- I hear what you're saying.  It surprises

25  me that you would say that.  You're doing a lot of things on

8

1   your own that simply are not correct.  You don't just put --

2   it's at your risk that it's -- you want to put somebody on

3   call, I can't stop you, but when we're ready for them and if

4   they're not here and if they're delayed by traffic or

5   something, the answer will be too bad.  So, just so you

6   understand that, the fact that lawyers -- everybody's busy,

7   you know, as far as being witnesses.

8          So, just so you understand, you need the Court's

9   approval to put people on call if you expect me to wait for

10  them, so we understand each other.  When we're ready for

11  them, we will -- in fact, we can be ready for them fairly

12  quickly, but that's -- we'll see.

13         Who else is in the audience?  I know --

14         MR. REISS:  Your Honor, if I may introduce, this

15  is Ms. Afra, Doctor Afra --

16         THE COURT:  She's not going to testify?

17         MR. REISS:  She's not going to testify.

18         MS. AFRA:  Good morning, your Honor.

19         THE COURT:  Good morning.  And?

20         MR. BIEGENZAHN:  And this is Ms. Namvar.

21         THE COURT:  Okay.  She's also not going to

22  testify?

23         MR. BIEGENZAHN:  No, sir, she's not.

24         THE COURT:  Okay.  I just wanted -- they're

25  certainly welcome.  All right.  You have to kind of remember

9

1 where we are in this case.  We have now -- because of my

2 procedure, the Plaintiffs -- both sides have presented their

3 evidence.  Plaintiff has put on his case, and the only

4 person here, of course, would be the Plaintiff, and do you

5 wish -- do you wish to -- as Debtors/Defendant, do you wish

6 to cross examine the Plaintiff's witness?

7        MR. BIEGENZAHN:  I do, your Honor, but it seems to

8 me that we ought to have some sense of what the Plaintiff's

9 case is because we have interposed objections to his

10 request, for example, for judicial notice which I think

11 is --

12        THE COURT:  Well, the judicial notice -- thank you

13 for reminding me.  It makes no sense to me.  You can't take

14 -- you just said take judicial notice to file.  What does

15 that mean?  If you want me to take judicial -- thank you for

16 reminding me.  I had forgotten about that.  That is really

17 not a proper request for judicial notice.  If there's some

18 particular document, then I can look at it and say yes or

19 no, but I'm not going to --

20        MR. REISS:  We will withdraw the request, your

21 Honor.

22        THE COURT:  Yeah.  I'm not going to just take

23 judicial notice of entire files without knowing what you

24 want.  Okay.  You ready now to cross examine?

25        MR. BIEGENZAHN:  Yes, your Honor.

10

1          THE COURT:  Okay  All right.  Would you step

2    forward, please?  Would you come up -- do you have a copy of

3    your -- oh, by the way, there's also another question.  This

4    has been one of my cases where I have a lot of questions.

5          Trial exhibits.  My clerk tells me that you don't

6    have copies of the exhibits.  I know, of course, I have the

7    exhibits.

8          MR. REISS:  I was unaware of that requirement.  I

9    can get the additional copies to the Court.

10          THE COURT:  But do both of you have copies?

11          MR. REISS:  Well, we all have copies of the

12    declarations, and that's -- those are the only exhibits.

13          MR. BIEGENZAHN:  And we have no exhibits, your

14    Honor.

15          THE COURT:  Okay.  I just wanted to make sure.

16    And the declaration you don't have copies?

17          MR. REISS:  I do not.

18          THE COURT:  And do you, Mr. Biegenzahn?

19          MR. BIEGENZAHN:  I'm sorry?  Do I have --

20          THE COURT:  Do you have a copy of Mr. Namvar's

21    declaration?

22          MR. BIEGENZAHN:  No, your Honor, I do not.  I

23    mean, I assume that Mr. Reiss --

24          THE COURT:  That's not meant to be a trick

25    question.  Do you have --

11

1        MR. BIEGENZAHN:  No, I didn't expect to have to

2 move it into evidence.  I assumed that --

3        THE COURT:  Oh, no, no.  No, that's a -- you're

4 assuming you say -- you're going one step ahead.  I didn't

5 ask you about that.  I said do you have a -- I assume you

6 have a copy for yourself?

7        MR. BIEGENZAHN:  Yes.

8        THE COURT:  And do you have one for Mr. Namvar?

9        MR. BIEGENZAHN:  I did not bring a declaration for

10 Mr. Namvar to testify from.

11        THE COURT:  And is that true --

12        MR. REISS:  Yes, but I can give my copy to the

13 witness when he testifies.

14        THE COURT:  Okay.

15        MR. REISS:  Not an issue.

16        THE COURT:  Okay.  The reason I say that is most

17 people do because when he goes to the stand, he'll, no

18 doubt, be asked about it, and unless you've got a -- I've

19 got a pretty good memory, but even so -- I like to look at

20 the thing.  You won't be able to look at his declaration.

21 That's all.

22        So, okay.  Would you please step forward and he

23 can put his declaration there so he -- I'm sure he's going

24 to be asked about it.  And would you raise your right hand,

25 please.

12

1              FARID AFRA - PLAINTIFF'S WITNESS - SWORN

2              THE COURT:  Okay.  Could you please state your

3    full name and spell it, please.

4              THE WITNESS:  Farid, F-A-R-I-D.  Last name Afra,

5    A-F-R-A.

6              THE COURT:  A-F --

7              THE WITNESS:  -- R-A.

8              THE COURT:  And it's pronounced Afra.  Okay.

9    Thank you, Mr. Afra.  Please be seated.

10             Okay.  Mr. Biegenzahn?

11             MR. BIEGENZAHN:  Thank you, your Honor.

12                        CROSS EXAMINATION

13   BY MR. BIEGENZAHN:

14   Q    First of all, as I understand it, you are Doctor Afra?

15   A    Yes.

16   Q    And are you a medical doctor?

17   A    Yes.

18   Q    Where did you get your medical degree?

19   A    In Iran.

20   Q    And are you licensed to practice in any state in the

21   United States?

22   A    Yes.

23   Q    What state or states are you licensed to practice in?

24   A    California.

25   Q    Are you currently practicing medicine?

13

1  A     Yes.

2  Q     Yes?

3  A     Yes.

4  Q     And what is the nature of your practice?

5  A     General surgery and cosmetic.

6  Q     And how long have you been a practicing doctor?

7  A     Since --

8          THE COURT:  I can't hear you.

9          THE WITNESS:  -- 1965.

10         THE COURT:  Okay.  Please speak into the

11 microphone.

12 BY MR. BIEGENZAHN:

13 Q     And, Doctor Afra, have you had any other education

14 since you received your medical degree?  And I don't mean

15 continuing education courses but any other disciplines?

16 A     Yes.  I had five years in general surgery, one year of

17 intensive and four year of surgery.  Then I became board

18 certified.  I took my exam in board and became board

19 certified, and then since then, as I say, I took a lot of

20 post-graduate courses, but the main one was subspecialty in

21 hair transplant.  So I took it with Doctor Marzerga

22 (phonetic).  He's very famous in this situation.  And then I

23 took one year of cosmetic surgery.

24 Q     Thank you.  And, Doctor Afra, how long have you been

25 involved in real estate investing?

14

1          MR. REISS:  Objection.  Assumes a fact not in

2 evidence.

3          THE COURT:  If you have an objection, could you

4 stand, please.

5          MR. REISS:  I'm sorry.  Objection, your Honor.  It

6 assumes a fact not in evidence.

7          THE COURT:  Well, he's asking the question.  So

8 it's overruled.  We're not going to get -- you know, this is

9 called preliminary sparring I guess, but -- or maybe, but

10 why don't you -- I'll allow the question.

11 BY MR. BIEGENZAHN:

12 Q    Doctor Afra --

13 A    What's the question?

14 Q    The question is how long have you been a real estate

15 investor, been involved in investing in real estate?

16 A    Real estate investor like it's not my job.

17          THE COURT:  So you don't do -- generally you don't

18 do real estate investment?

19          THE WITNESS:  No, just occasionally if I have

20 extra money I do that.

21          THE COURT:  Okay.

22 BY MR. BIEGENZAHN:

23 Q    Other than buying or selling a residence, how many real

24 estate transactions have you invested in?

25 A    Maybe four or five in my lifetime.

15

1  Q    Over what period of time?

2          THE COURT:  He just said over his lifetime.

3          MR. BIEGENZAHN:  I understand that to be the outer

4  limit.

5          THE COURT:  Okay.  You mean you want to know how

6  far apart these were?

7          MR. BIEGENZAHN:  Right.  The notion, quite simply,

8  your Honor, is this transaction --

9          THE COURT:  Well, rather than argue, why don't you

10 just ask -- let me ask -- you said about four or five.  Were

11 these like within a year or two or over what period of time?

12         THE WITNESS:  Since 1979.  That's --

13         THE COURT:  Okay.  And were these all in one year

14 or just kind of spread out over that time?

15         THE WITNESS:  No, it's spread out, and really I

16 don't know --

17         THE COURT:  okay.

18         THE WITNESS:  -- how.

19 BY MR. BIEGENZAHN:

20 Q    Does that include real estate loans that you have made

21 as the lender?

22 A    No.  The real estate loan, I did it because I wanted my

23 money to be available for the -- to buy the different

24 things.

25         THE COURT:  You're talking about this case here,

16

1  the loan on this case?

2          THE WITNESS:  No.  No, all together.

3          THE COURT:  Okay.

4          THE WITNESS:  No, I'm not a loaner.

5          THE COURT:  Okay.  You're not in the business of

6  making loans?

7          THE WITNESS:  No.

8          THE COURT:  All right.

9  BY MR. BIEGENZAHN:

10  Q    But you have made real estate secured loans, am I

11  correct?

12  A    Yes.

13  Q    How many?

14          MR. REISS:  With the Court's permission, could I

15  ask counsel to please clarify whether he means as a borrower

16  or a lender?

17          THE COURT:  No.  I assumed -- I assume you're

18  talking about lending money as opposed to being on the

19  borrowing side.

20          MR. BIEGENZAHN:  That's correct, your Honor.

21          THE COURT:  All right.

22          MR. BIEGENZAHN:  At this stage.

23          THE WITNESS:  Three or four.

24  BY MR. BIEGENZAHN:

25  Q    You have made three or four real estate loans?

17

1  A     Yes.

2  Q     And how were those loans documented?

3  A     All of them.

4  Q     By you?

5  A     What do you mean by me?

6  Q     Did you draft the documents?  Did you retain counsel to

7  draft the documents?

8          THE COURT:  You mean the loan documents.

9          THE WITNESS:  I don't understand.

10         THE COURT:  Like the note, things of that sort,

11 did you do that yourself or did you have somebody help you?

12         THE WITNESS:  Your Honor, usually -- it was done

13 by the one that -- I made the loan.

14         THE COURT:  Okay.  So the people who you loaned it

15 to would prepare the note and the loan documents?

16         THE WITNESS:  Yes, and they -- they took it to the

17 city to registrar to --

18         THE COURT:  I'm not sure I'm understanding your

19 answer.  When you make a loan, you usually have some sort of

20 a note, something to evidence the loan.

21         THE WITNESS:  Yes.

22         THE COURT:  Did you prepare that or did the other

23 person prepare that?

24         THE WITNESS:  The other person prepared it.

25         THE COURT:  Okay.

18

1  BY MR. BIEGENZAHN:

2  Q    So the borrower prepared the loan documentation?

3  A    Yes.

4  Q    But did you review it?

5  A    Yes.

6  Q    And in -- let me start with the question of size.  How

7  large were the four or five loans that you've described?

8  A    Between $100,000 to maybe $1,000,000.

9  Q    And the $1,000,000 loan, when was that made?

10 A    I did it with Mr. Namvar.

11       THE COURT:  Was that the loan involved in this

12 case or is that another loan?

13       THE WITNESS:  Yes.

14       THE COURT:  All right.

15 BY MR. BIEGENZAHN:

16 Q    So in -- you're describing the loan that is at issue

17 here?

18 A    Right.

19 Q    Okay.  And your testimony is that you've only made four

20 or five real estate secured loan?

21 A    About, that's right, as I remember.

22 Q    Did -- did you ever make a loan to a Mr. Yamin?

23 A    Yes.

24 Q    And how large was that loan?

25 A    Four hundred thousand.

19

1          THE COURT:  I'm sorry, $400,000?

2          THE WITNESS:  Yes.

3          THE COURT:  All right.  Thank you.

4    BY MR. BIEGENZAHN:

5    Q     And the loan to Mr. Yamin was secured by what

6    collateral?

7    A     By his house.

8    Q     His house?

9    A     Yes.

10   Q     And when you made these loans, did you do any sort of

11   due diligence regarding your collateral?

12   A     Yes.  I read the papers.  I get the address, go and

13   look at the place and then look at the appraiser if they

14   have their appraisal.  I look at the surrounding area to see

15   if it -- with my limited knowledge if it is worthwhile, and

16   then I do it.

17   Q     And did you --

18   A     And all of them have been secured.

19   Q     Did you do any due diligence with respect to the Artek

20   loan?

21   A     Yes, I did.

22   Q     And what was that due diligence?

23   A     Okay.  Again, I got the address, and I got the Mapquest

24   from them.  They gave it to me.  I went and look at it with

25   my friend, Mr. Zaghi, and we looked at the surrounding area,

*Briggs Reporting Company, Inc.*

20

1  look at the -- you know, property, and we decided that it's

2  worth for the money that we are loaning.

3  Q    And did you talk to Mr. Hakakian or anyone at Artek in

4  advance?

5  A    No, I did not.

6  Q    You didn't?

7  A    No.

8  Q    You didn't speak to him?

9  A    No.  You mean ever?

10 Q    No, just with respect to the transaction.

11 A    No.

12 Q    And the Yamin residential loan, did you foreclose on

13 that property?

14 A    Yes.

15 Q    In your name or in the name of the trust?

16 A    Right now I don't remember.

17 Q    You don't remember?

18 A    I don't remember.  It can be either way.

19 Q    And how long ago was that?

20 A    I don't know, 25 years ago.

21 Q    Twenty-five?

22 A    Yes, something in that area, 20 to 25.

23 Q    Just to make it clear, that was in the United States?

24 A    Yes.

25 Q    And where is the property located?

21

1  A      450 Tuesday Place.

2  Q      The city?

3  A      Beverly Hills.

4  Q      Thank you.  Now, let me backtrack.  I promised the

5  clerk that I would help with this.  You made reference to a

6  man.  I think you said Zaghi.

7  A      Yes.

8  Q      Is that spelled Z-A-G-H-I?

9  A      Yes.

10         MR. BIEGENZAHN:  Stacey made me promise that I

11 would try to make sure the names got into the record.

12         THE COURT:  Okay  Well, you've fulfilled your

13 promise.

14         MR. BIEGENZAHN:  Thank you.

15 BY MR. BIEGENZAHN:

16 Q      Doctor Afra, you submitted a declaration in this case,

17 correct?

18 A      Yes.

19         MR. BIEGENZAHN:  And, your Honor, beforehand we

20 delivered up to the clerk a copy just for his references, as

21 I indicated, not an exhibit but designed to allow the

22 Plaintiff to follow along.  If we could hand that to the --

23         THE COURT:  You lost me.  Are you talking about a

24 copy of his declaration or something else?

25         MR. BIEGENZAHN:  A copy of his declaration.

22

1          THE COURT:  Okay.  I wish you had -- that's what

2   -- Mr. Reiss just handed him the -- we had this

3   conversation, whether he had an extra copy and he put a copy

4   before him.

5          MR. BIEGENZAHN:  Great.

6          THE COURT:  You must have missed that

7   conversation, but that's -- so, yes, he has a copy of his

8   declaration.

9          MR. BIEGENZAHN:  Then, your Honor, I will at some

10  point retrieve the extra copy that I provided.

11         MR. REISS:  With the Court's permission, if there

12  is such an extra copy, I'd like --

13         THE COURT:  Sure.  Why not?  I think Mr. Reiss

14  would like -- oh, I see it's not there unfortunately.  So

15  okay, why don't we just leave it the way it is.

16         MR. REISS:  Very well, your Honor.

17         THE COURT:  All right.

18  BY MR. BIEGENZAHN:

19  Q    Doctor Afra, in paragraph four of your declaration you

20  start --

21  A    What are you talking about?

22         THE COURT:  Your declaration.  You have it there.

23  Paragraph four, which would be at --

24         MR. BIEGENZAHN:  Page two, line seven.

25         THE COURT:  On page two, you see it there?

23

1          THE WITNESS:  Number four?

2          THE COURT:  It's --

3          MR. BIEGENZAHN:  Paragraph number four, yes.

4          THE COURT:  Yes.  "Based on discovery I've

5   conducted, I have learned the following," is that what

6   you're talking about?

7          MR. BIEGENZAHN:  Yes, your Honor.

8          THE COURT:  Do you see that?

9          THE WITNESS:  Yes.

10          THE COURT:  Okay.  Fine.

11   BY MR. BIEGENZAHN:

12   Q    Doctor Afra, my first question is what discovery is it

13   that you are talking about in that paragraph?

14   A    It's not the -- the one that says right under it?

15   Q    Well, the phrase is:

16          "Based on discovery that has been

17          conducted by my attorney, I have learned

18          the following."

19      And then you have (a), (b), and (c).

20   A    Yes.

21          THE COURT:  And your question is?

22          MR. BIEGENZAHN:  What discovery is it that we're

23   talking about there.

24          THE COURT:  I don't understand your question.

25   What did he do, what did his attorney do?  I'm not sure what

24

1   your --

2           MR. BIEGENZAHN:  Your Honor, the phrase is "Based

3   on the discovery."

4           THE COURT:  Right.

5           MR. BIEGENZAHN:  And my question is what discovery

6   was that.

7           THE WITNESS:  Conducted by my attorney.

8           THE COURT:  It does say there "Discovery that has

9   been conducted by my attorney."  So this is what your

10  attorney found out for you?

11          THE WITNESS:  Correct.

12          THE COURT:  Okay.

13  BY MR. BIEGENZAHN:

14  Q    And do you know what discovery he did?

15  A    It's in front of you.

16  Q    No, it's not.  What's in front of me is a declaration,

17  and I'm -- I'm curious if this was discovery in this

18  adversary proceeding, in a State Court case which you

19  brought against Artek and Mr. Hakakian or was it from some

20  other source.

21  A    Now you are asking me the lawyer questions that I don't

22  know.  I told you that my lawyer prepared it.  If you have

23  any question, ask Mr. Reiss.

24          THE COURT:  Let me ask you this, Doctor Afra.

25  Obviously you had conversations with your lawyer, and did he

25

1  give you documentary evidence or how did -- the evidence,

2  for instance, about this note and all, did he -- did --

3  after talking with your lawyer, did you actually see the

4  note?

5          THE WITNESS:  Your Honor, really this note is the

6  -- the information is the information that we got from the

7  document that Mr. Namvar gave us.

8          THE COURT:  And is that -- the information in, for

9  instance, (a) talks about the note and all and the deed of

10 trust.  Are those things that actually -- that Mr. Namvar

11 actually gave you as part of this deal?

12         THE WITNESS:  Yes.

13         THE COURT:  Okay.  So you already had it before?

14 I mean, you had it at the time he gave it to you, is that

15 correct?

16         THE WITNESS:  Correct.

17         THE COURT:  Okay.

18 BY MR. BIEGENZAHN:

19 Q    Doctor Afra, did you draft the declaration that is your

20 testimony, the declaration that is in front of you?

21 A    Draft it?

22 Q    Yes, did you write it?

23 A    No.  I have a lawyer.  Why should I draft it?

24 Q    Your counsel in the adversary proceeding drafted this

25 entire declaration for you, is that correct?

*Briggs Reporting Company, Inc.*

26

1  A    Well, it's -- with the information that I have and the

2  information that he had, you know, we draft it and signed

3  it.

4          THE COURT:  So let me understand.  I think I

5  understand you said you had discussions with your lawyer,

6  and after that, then he prepared the document?

7          THE WITNESS:  Right.

8          THE COURT:  All right.

9  BY MR. BIEGENZAHN:

10 Q    Did you edit it?

11 A    I don't remember.

12 Q    Did you revise it?

13 A    I don't remember.

14         THE COURT:  Is it accurate?  You're reading it now

15 again.  Is it accurate?

16         THE WITNESS:  Your Honor, as far as I know, yes.

17         THE COURT:  All right.  Because it is your

18 declaration.

19         THE WITNESS:  I'm too nervous to read it right

20 now.

21         THE COURT:  I understand that.  It is -- it's not

22 the greatest fun to be a witness on the stand, but it is

23 your declaration under penalty of perjury.  You're satisfied

24 it is accurate?

25         THE WITNESS:  Right.

27

1          THE COURT:  Okay.

2          THE WITNESS:  Thank you.

3  BY MR. BIEGENZAHN:

4  Q    Doctor Afra, am I correct that you are the Plaintiff in

5  an action in the State Court against Mr. Hakakian and Artek?

6  A    Yes.

7  Q    And is it possible that the discovery you referred to

8  in paragraph four was conducted in that proceeding?

9  A    No.  As I told you, it's the information that Mr.

10  Namvar gave me, and we collected information and put it

11  here.  It's not belong to any special meeting or any special

12  court.  It's the paper that is documented in part of the

13  docs that I got

14  Q    In connection with the State Court litigation against

15  Artek and Mr. Hakakian, did you file a lis pendens on the

16  underlying property?

17  A    Yes.

18  Q    And do you believe you have a claim against Artek?

19  A    I have a claim against Artek and against Mr. Namvar,

20  and none of them is solid right now.  My money is almost

21  gone.

22  Q    I'm sorry.  None of the claims are solid, is that what

23  you said?

24  A    I said I don't have anything solid.  Mr. Namvar doesn't

25  give me the money, and Artek I cannot foreclose.  So I don't

28

1  know what I have.  I thought I had it, his word.  I thought

2  I had his promise.  I thought that I had a good document,

3  but I end up with nothing right now this minute.  Otherwise,

4  I would not be in here.

5        THE COURT:  So far.  Apparently you have two

6  suits.  You have this suit.  Plus you have the State Court

7  lawsuit.

8        THE WITNESS:  Right.

9        THE COURT:  All right.

10  BY MR. BIEGENZAHN:

11  Q    Now, in paragraph 6(a) of your declaration, you speak

12  of a conspiracy.  When you use that word, what does it mean

13  to you?

14  A    When two people talk to each other and plan something

15  that the third person doesn't know and then the third person

16  get involved without knowing what he's walking into, and

17  then it has been some setting between those two without the

18  knowledge of the third person.

19        THE COURT:  Let me ask you.  Mr. Biegenzahn has

20  raised the question, so I'll ask you.  In the state lawsuit,

21  what do you understand would be the defense to your action?

22  Why haven't they just paid you?  What is their defense in

23  the papers that they've answered in the answer?  What do you

24  understand the defense to be?  Do you understand my

25  question?

29

1          THE WITNESS:  Like my defense or --

2          THE COURT:  No, no.  You've sued them on this note

3   and trust deed.  What do you understand their defense to be

4   to your -- why do they say they don't owe you any money?

5          THE WITNESS:  I didn't ask.

6          THE COURT:  No, no, no.  The lawsuit, do you

7   understand what they -- you filed a complaint, and then they

8   -- and I know what your complaint is.  We have it.  My

9   question is they filed an answer.  Do you understand why it

10  is they say that they don't have to pay you or you can't

11  foreclose?

12         THE WITNESS:  Your Honor, I know that they

13  intentionally misstated the documents that they gave me.

14  This is the secured document.

15         THE COURT:  No.  You're not understanding.  My

16  question is why did they say -- what is your understanding

17  of why they say that they don't have to pay you?  You have a

18  note and a deed on a property.  Why do they say they don't

19  have to pay you?  Do you understand my question?

20         THE WITNESS:  When Mr. Hakakian says that Mr.

21  Namvar should pay, Mr. Namvar says you have a security.  So,

22  meanwhile, I have nothing.

23         THE COURT:  Okay.  All right.  Mr. Biegenzahn?

24  BY MR. BIEGENZAHN:

25  Q    But a claim in the Namco bankruptcy case.  Doctor Afra,

30

1  in paragraph seven you testified that you were approached by

2  Mr. Namvar?

3  A    Yes.

4  Q    Do you see that?

5         THE COURT:  That's on the next page, on page three

6  I believe.

7         MR. BIEGENZAHN:  Yes, your Honor, page three, line

8  roughly 12 and a half.

9         THE COURT:  Do you have that?

10        THE WITNESS:  I have it.

11 BY MR. BIEGENZAHN:

12 Q    Is it your testimony that he came to you and asked you

13 for money?

14 A    Do I need to explain how it happened?

15 Q    Please.

16 A    I and Mr. Zaghi went to Sean Namvar, his brother, to

17 buy something.  He says, "I don't have anything to sell to

18 you.  I can take you to Ezri.  He may have something to give

19 to you.  Maybe he has two and you can choose."  We said

20 fine.  So Sean came with me and Zaghi.  We went to Mr.

21 Namvar's house, office.  He took us to Mr. Havari's

22 (phonetic) office, and we asked about some -- so far, the

23 way that you asked how it happened, it's what happened.  We

24 went to his office, and we said we want to buy some

25 properties, and he told us, "Yes, we have a few of them.  I

31

1  can give you at least a few." I guess it was Thursday. "I

2  can give you a disk of it by Monday. And in the meanwhile,

3  how much do you want to put down?" Mr. Zaghi said, "I want

4  to put down $1,000,000." He said, "What about you, Farid?

5  Do you want to put $1,000,000 too?" I said, "Okay. I put

6  $1,000,000 too."

7       So as soon as we said that, Mr Namvar said, "Okay. I

8  have the list for you by Monday. Can you give me the money

9  now because I need it, and then Monday we do the

10 transaction?" We said okay but we need some security. He

11 said, "Okay. I give you a promissory note." I said, "I

12 respect you, but it's a business. I want something secured,

13 maybe some real estate or something," and he said, "Okay. I

14 have this real estate." It was -- belonged to Artek. I

15 didn't know of Artek at that time. It's in Artesia, who

16 loaned $4.3 million on it and who can bring you a -- and

17 take that. We said okay. Give the address to us. He gave

18 us the address with the direction. The same day --

19 (indiscernible) answer your question because we went to buy

20 something, some real estate, and he said to give me the

21 money and then by Monday you have it. So we've got to give

22 securities for short time to buy something. Your Honor, I

23 was not there and Mr. Zaghi was not there. I was not there

24 for loaning any money. We were there to buy some property.

25 Q    Thank you very much for your narrative and your candor.

32

1 So I take it that the statement "I was approached by

2 Defendant asking that I loan money to Namco" is not quite

3 correct?

4 A    It's absolutely correct because we went to buy --

5         THE COURT:  Let me stop you.  It is correct the

6 way he said it.  He asked to go.  When he got there, Mr.

7 Namvar asked him to loan the money.  So, anyway, it's --

8 I've heard the testimony.  So why don't you move on.  I

9 understand you might have looked at different views on it,

10 but I think what he says is consistent with his testimony.

11        MR. BIEGENZAHN:  And, with all due respect, your

12 Honor, I disagree.  This says --

13        THE COURT:  Okay.  That's fine.  Your --

14        MR. BIEGENZAHN:  -- "I was approached" --

15        THE COURT:  Let me stop you.  You can disagree all

16 you want, but I don't want you to get -- you're getting

17 argumentative with the witness.

18        MR. BIEGENZAHN:  Very well.

19        THE COURT:  He said what he said.  You can argue

20 later, but I don't want you to argue with him or me for that

21 matter.

22 BY MR. BIEGENZAHN:

23 Q    So you went to see Sean Namvar, correct?

24 A    Right.

25 Q    And what you and Mr. Zaghi had in mind was to purchase

33

1  real property?

2  A      Yes.

3  Q      Now, Sean Namvar is the principal of EquiMax?

4  A      Yes, and Tri Fish, yes.

5  Q      And did you ever make loans to or through EquiMax?

6  A      Yes.

7  Q      Or Tri Fish?

8  A      Yes.

9  Q      And which of the four or five loans to which you

10 testified were those loans?

11 A      What do you mean?

12 Q      How many loans did you make to or through EquiMax?

13 A      Maybe two or three of them.

14 Q      And how many through Tri Fish?

15 A      EquiMax, Tri Fish -- I knew Sean.  So he had in

16 different names.  I was not familiar.  I was giving it to

17 Sean mostly towards Tri Fish I guess.

18 Q      So you made loans to an entity owned or controlled by

19 Sean Namvar?

20 A      Yes.

21 Q      And you made a number of them.  How large were they?

22 A      Always, your Honor, I went to Sean.  Again, I didn't

23 want to loan money to Sean.  I wanted him to hold the money

24 because I was looking for real estate, and he told me then

25 -- he promised me that if he find a good real estate,

34

1 because he's getting back and forth and will give it to me.

2 So --

3       THE COURT:  And this -- on this particular

4 transaction I think you've said in your declaration you were

5 also looking to buy something?

6       THE WITNESS:  Right, right, always, without

7 exception.  I didn't want to --

8       THE COURT:  So you're basically, I understand --

9 correct me if I'm wrong, but you're not really in the

10 lending business.  You like -- every now and then you like

11 to buy something?

12       THE WITNESS:  Right.

13       THE COURT:  All right.

14       THE WITNESS:  Okay.  So always I told him that

15 this money is not for a loan because he asked me to sign for

16 one year and two years.  Always I said I do what you say,

17 but I want to have it back by 15 days notice, and that's

18 exactly what happened with Mr. Namvar too.  I said I don't

19 want it, and it may be in 15 days I have something to open

20 escrow.  I want my money, always.

21       THE COURT:  So this was, as I understand --

22 correct me if I'm wrong, this was at eight percent interest

23 and you can get it back on 15 days' notice, is that correct?

24       THE WITNESS:  Yes.

25       THE COURT:  All right.

*Briggs Reporting Company, Inc.*

35

1 BY MR. BIEGENZAHN:

2 Q    And on the EquiMax and Tri Fish loans, what was the

3 rate of return to you?

4 A    Eight percent.

5 Q    Eight?

6 A    The way I remember it.  I may be wrong, but the way I

7 remember it.

8 Q    And I apologize.  I asked the question about how large

9 the loans were, and I don't know if I heard the answer.  I

10 know it's not in my notes?

11 A    I told you my loans were between 100 -- with him I

12 guess up to six, seven hundred.  I don't remember if I ever

13 had more than that.

14 Q    Now, did you come back or did Mr. Namvar deliver to you

15 on Monday by some other means the list, the collateral list

16 that you had talked about on the Thursday before the Monday?

17 A    No.  No, unfortunately not.  And Mr. Zaghi is my friend

18 that usually would buy something.  He buys and give me a

19 share or something.  So I let him handle it because he was

20 informative about the prices, the (indiscernible).  So he

21 was involved in everything as far as I know.  We never

22 brought anything that -- anything that -- or could buy.

23 Q    Now, I want to make sure I understand this.  You let

24 Mr. Zaghi negotiate the Artek transaction?

25 A    No.

36

1  Q    I thought that's what you just said.

2  A    No, no.  Artek, it was loan.  You asked about buying

3  something.  Remember?

4  Q    Well --

5          THE COURT:  Anyway, your discussion a moment ago

6  was about buying things.  This is different.

7          THE WITNESS:  Right.  Right.  It was about buying.

8  It was not about giving loans.

9          THE COURT:  So if you were going to buy something,

10  he would make more of an investigation for you?

11          THE WITNESS:  Right.

12          THE COURT:  Okay.

13  BY MR. BIEGENZAHN:

14  Q    But in the lending transactions, he didn't participate?

15  A    He was there.  I was there.  Mr. Namvar was there.  Mr.

16  Tabar was there.  Sean was there for a short while.  After

17  that, Moussa was there.

18  Q    And for the clerk, Sean is spelled S-E-A-N.  Moussa is

19  M-O-U-S-S-A, and I apologize, I did not spell Hakakian

20  earlier, H-A-K-A-K-I-A-N.  I think.

21          THE COURT:  I'm looking at the declaration.

22  That's what it says.

23          MR. BIEGENZAHN:  Well, that was for the clerk,

24  your Honor.

25          THE COURT:  Close enough.  All right.  Thank you.

37

 1 | BY MR. BIEGENZAHN:

 2 | Q    In your declaration -- this is on page five, Doctor

 3 | Afra -- you testified that interest was paid through the end

 4 | of September.

 5 | A    Which part?  I'm sorry.

 6 | Q    I'm sorry, paragraph 23.

 7 | A    Twenty-three.

 8 |         THE COURT:  On page five.

 9 |         THE WITNESS:  Yes.

10 | BY MR. BIEGENZAHN:

11 | Q    I assume that's correct.  How much interest was paid

12 | each month?

13 | A    I don't remember the exact amount, but he paid me eight

14 | percent for the first month and the second and then after

15 | that not at all.

16 | Q    And when you use the pronoun "he," you really mean --

17 | A    When I use what?

18 | Q    -- you really mean Namco, don't you?

19 | A    When I use what?

20 | Q    You just said "He paid me," but you -- the accurate

21 | statement would be Namco paid you that interest, correct?

22 | A    Right.  I don't know Namvar or Namco.

23 |         THE COURT:  Do you remember whose name was on the

24 | check?

25 |         THE WITNESS:  No, I don't know if it was Namco or

38

1  Namvar.

2          THE COURT:  Okay.

3  BY MR. BIEGENZAHN:

4  Q    So it's possible you got a personal check from Mr.

5  Namvar?

6  A    That's possible.  I don't --

7  Q    Now, in paragraph 25 of your declaration, you say that

8  Mr. Namvar never revealed that there was -- and it's in

9  quote -- a run on the bank.  What did you mean by that?

10          THE COURT:  You're talking about paragraph 24?

11          MR. BIEGENZAHN:  Twenty-five, your Honor, line 13

12  and a half.

13          THE COURT:  Oh, I'm sorry.  You're right, 25.

14          THE WITNESS:  (Indiscernible.)

15          THE COURT:  Excuse me?

16          THE WITNESS:  I may have -- I don't --

17          THE COURT:  Let me read it to you.  It says:

18          "Defendant Namvar" -- this is your

19          declaration -- "never revealed to me at

20          the time I was making the loan to Namco

21          there was a run on the bank and that

22          neither he nor Namco were able to repay

23          the hundreds of lenders who were then

24          demanding their money."

25          I guess the question is what do you mean by "run

39

1  on the bank," that there was a run on the bank?

2         THE WITNESS:  I guess like he didn't have money

3  and then he was --

4         THE COURT:  I understand what you mean by it.

5         THE WITNESS:  I didn't know that.

6         THE COURT:  Pretty common term, run on the bank.

7  It was that people were demanding money and there wasn't

8  enough to pay the money.  Is that what you meant by that?

9         THE WITNESS:  Right.

10        THE COURT:  Okay.  That's what I read it to mean.

11  Well, I'm not trying to put words in your mouth, but that's

12  what the common knowledge would be of that.  Is that what

13  you meant?

14        THE WITNESS:  No, my wording is not -- I

15  appreciate your Honor should once in a while correct my

16  wording because --

17        THE COURT:  No, it wasn't meant to correct

18  anything.  I wanted to know what you meant by that.  Did you

19  mean by that the normal --

20        THE WITNESS:  Right.

21        THE COURT:  -- that people were demanding --

22  because you said it in the next part of that sentence.  I

23  just wanted to know is that what you meant.

24        THE WITNESS:  Yes.

25        THE COURT:  I don't mean to belabor it, but I'm

40

1  sorry of having a slight -- anyway, go on, Mr. Biegenzahn.

2  BY MR. BIEGENZAHN:

3  Q    Your testimony in this paragraph is that at the time

4  you made the loan -- and you made the loan in July, am I

5  correct?

6  A    July 17, yes.

7  Q    Is it your testimony that in July of 2008 there was a

8  run on the bank?

9  A    Now, now or then?

10 Q    Well, it's your testimony.  If it isn't what you meant,

11 now is the opportunity to correct it or to clarify it.

12 A    I meant it because I understood that later.  I didn't

13 know then.

14      THE COURT:  Maybe I can clarify.  I think Mr.

15 Biegenzahn's question is at the time you made the loan, is

16 it your opinion that there was so-called run on the bank at

17 that time, that people -- as you were making the loan, that

18 people were demanding money from him?  Is that what you

19 meant by it, because that's what it appears to say?

20      THE WITNESS:  I didn't know that.

21      THE COURT:  No, no.

22      THE WITNESS:  I didn't know that.

23      THE COURT:  I know you didn't know that.  My

24 question is are you saying now that you believe that even at

25 the time you loaned the money people were trying to get

*Briggs Reporting Company, Inc.*

41

1 money from him?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.

4 BY MR. BIEGENZAHN:

5 Q    And it's your testimony that in July of 2008, hundreds

6 of lenders were demanding their money?

7 A    That respectively I see that he got money from hundreds

8 of people and didn't pay them back.  The way I understood

9 finally, it was around 200 or 400 people.

10 Q    And what did you base that on either in July or late

11 August of 2010 when you signed this declaration?

12 A    Well, because I have been in court.  I see the people

13 that are coming.  I see that is -- they are talking about

14 400 million to six hundred million.  So I -- in the

15 community I see different people from all over, and it's my

16 recollection that is --

17 Q    Doctor Afra, when you use the term "community," what do

18 you mean?

19 A    Persian/Jewish community.

20 Q    In Los Angeles?

21 A    Yes.

22 Q    Or in the area of Los Angeles.  How many people are in

23 that community?  Have you any idea?

24 A    I don't know, 30, 40 thousand.

25 Q    Thirty or 40?

42

1  A     Thousand.

2  Q    Oh, thousand, okay.  Because until I started working on

3  this case, I had never heard it, and since I have worked on

4  this case, I have never had anyone, thank you very much,

5  give me an idea of how many people that might encompass.

6  A     It's about that.

7  Q    In paragraph 28 you testify:

8              "There is no question that Namvar knew

9              that the Artek loan documents were not

10             legitimate."

11 A     Right.

12 Q    On what do you base that testimony?  Did he tell you

13 that?

14 A     Pardon me?

15 Q    Did he tell you that?

16 A     Well, it said in the deposition last time that we're

17 here, he said he never gave money to Artek and --

18             THE COURT:  Well, let me ask you this to cut

19 through all this because I read all the papers and all.  Are

20 you basing it -- it sounds like that you are, but correct me

21 if I'm wrong.  There is a typed up declaration or maybe

22 declaration -- it's a statement on the Namco stationary as I

23 recall by Mr. Namvar saying in effect that he never funded

24 that loan.  You know that?

25             THE WITNESS:  Yes, your Honor.

*Briggs Reporting Company, Inc.*

43

1           THE COURT:  It seems to me, reading all this, that

2  that's what you're basing your feeling that this was all

3  phoney?

4           THE WITNESS:  Yes, your Honor, because it said he

5  never paid --

6           THE COURT:  No, I understand that.  Is that the

7  only thing you're basing it on is that note?  Without that

8  thing that he stated, would you have any evidence other than

9  he hasn't paid you, of course, that there was something

10  wrong going on?

11           THE WITNESS:  Based on (indiscernible) deposition

12  and Tabar deposition, all of them, and based on what -- what

13  he told me personally.

14           THE COURT:  Okay.  So it was based on the note

15  plus the two depositions?

16           THE WITNESS:  (Indiscernible.)

17           THE COURT:  Okay.  Thank you.

18  BY MR. BIEGENZAHN:

19  Q    Doctor Afra, please turn to page six of your

20  declaration.  In paragraph 33 you say:

21           "By virtue of" --

22  A    Excuse me, Mr. -- yes, sir.

23  Q    You say:

24           "By virtue of that letter, I have been

25           unable to enforce the security interest

44

1          granted to him."

2      I assume you mean you.

3          THE COURT:  Is there a question there?

4          MR. BIEGENZAHN:  I -- oh, he looks like he's

5  catching up.

6          THE COURT:  Okay.  You've seen that, right?

7          THE WITNESS:  Yeah.

8          THE COURT:  Okay.

9          THE WITNESS:  Do you want me to check --

10  BY MR. BIEGENZAHN:

11  Q    Well, first I want you to tell me whether that's a

12  typographical error when you say "granted to him."  I assume

13  you mean granted to you.

14  A    Well, really both of the amazingly is right, because

15  the Artek gave it to him.

16          THE COURT:  Him being who?

17          THE WITNESS:  To --

18          THE COURT:  I see.  I see.

19          THE WITNESS:  -- and (indiscernible) gave it to

20  me.  So if I say me, it's right.  And if I say him, it's

21  right because he --

22          THE COURT:  Okay.  I understand now.

23          MR. BIEGENZAHN:  Thank you very much.

24          THE COURT:  Thank you.

25  //

45

1  BY MR. BIEGENZAHN:

2  Q    But you really didn't mean granted to him.  You meant

3  granted to Namco, yes?

4  A    As I said before, I don't know it's Namco or Namvar.

5         THE COURT:  It's pretty obvious you treated them

6  both pretty much the same, did you not?  They're separate

7  entities, of course, but it sounds like your testimony has

8  been, correct me if I'm wrong, has been treating all this --

9  you treated them the same?

10        THE WITNESS:  Yes.

11        THE COURT:  All right.

12 BY MR. BIEGENZAHN:

13 Q    And notwithstanding that letter and the State Court

14 action, you take the position that the note is enforceable,

15 is that correct?

16 A    What?  The note is what?

17 Q    The Artek note is enforceable?

18        THE COURT:  I don't know --

19        THE WITNESS:  So far it hasn't been because I

20 couldn't foreclose.  If it would have been enforceable, by

21 now I'd have my money because I could have -- it's two years

22 now.  I could have foreclosed.  So I don't know really I

23 can't get it from them or not.

24        THE COURT:  Well, let me ask you this, Doctor

25 Afra.  You said by virtue of the letter.  I get the idea,

46

1  correct me if I'm wrong, that -- tell me how has that

2  letter, if at all, affected your State Court litigation to

3  enforce the note trust deed?  Has that had -- has that

4  letter had any effect on your ability to end the lawsuit?

5          THE WITNESS:  Absolutely, because he didn't give

6  any money to Artek.  Artek says I did not receive money so I

7  don't owe money.

8          THE COURT:  No, I understand that, but I'm saying

9  in the litigation in the State Court, has that letter come

10 up in the defense or has it come up in the State Court

11 litigation?  Has the -- are the Defendants, for instance,

12 saying that because of this there's really no legitimate

13 trust deed?  Do you understand my question?

14         THE WITNESS:  Yes.  That (indiscernible).

15         THE COURT:  So you don't know whether --

16         THE WITNESS:  I know it just by virtue of here is

17 that --

18         THE COURT:  Okay.  You don't --

19         THE WITNESS:  -- that answer --

20         THE COURT:  Okay.  Fine.  So you don't know.

21 Okay.  Thank you.

22         MR. BIEGENZAHN:  Your Honor, if I may just a

23 moment look at my notes.

24         THE COURT:  Sure.

25 //

47

1  BY MR. BIEGENZAHN:

2  Q    Let me circle back just for a moment.  The real estate

3  secured loans that you have made, three or four to --

4  A    Are you reading from some place?

5  Q    No, no, no.  Well, from my notes.

6  A    Okay.

7  Q    For what good that does -- three or four to EquiMax?

8  A    Would you start again?

9  Q    Okay.  Real estate loans, three or four to EquiMax, is

10 that correct?

11 A    I don't know really how many, maybe two or three, yes.

12 Q    Okay.  Two or three to EquiMax, how many to Tri Fish?

13 A    Tri Fish and exactly like Namvar and Namco, Tri Fish,

14 EquiMax whether --

15 Q    So you don't recall --

16 A    No.

17 Q    -- how many times Tri Fish was the borrower, if any, or

18 how many times EquiMax was the borrower?

19 A    I don't know how many this, how many that, but I know

20 that I knew both of them.

21 Q    Okay.  And did you -- we talked about the loan to

22 Yamin.  Did you make a loan to Hakimian?

23 A    Hakimian?

24 Q    Yes, or Hakimi?  Is that a name you recognize among the

25 community?

48

1  A    No.

2  Q    How about Hikali?

3  A    Hikali, yes.

4  Q    Hikali?

5  A    Yes.

6  Q    Did you make a real estate secured loan to Mr. or Ms.

7  Hikali?

8  A    Yes.  He bought a house for me and asked me to carry,

9  and he was really indebted to me because I carried.  He

10 said, "If you wouldn't have carried the note, I was not able

11 to have the house," he and his wife told me more than 100

12 times, and really each time they wanted to kiss me and kiss

13 me, but unfortunately, finally, they decided they don't want

14 to keep it.

15 Q    Did you foreclose on that home?

16 A    No.

17 Q    Is that all of the real estate secured loans that you

18 have made that you can recall here today?

19 A    Yeah, as far as I can.

20 Q    And, again, if I'm correct in my recollection, the

21 magnitude was from $100,000 to $1,000,000?

22 A    Yeah.

23 Q    You seem indifferent.

24 A    Pardon me?

25 Q    Is that --

*Briggs Reporting Company, Inc.*

49

1  A    Yes, maybe.  I --

2          THE COURT:  I don't see that he's indifferent.

3          THE WITNESS:  Do not --

4          THE COURT:  He's saying it's in that -- it's in

5  that range.

6          THE WITNESS:  Yeah.  I don't have exactly if it

7  was $95,000 to $1,000,000 or if it was $90,000 to $900,000.

8  I don't know.  You said give me the ball figure, I gave you.

9  Now you want to --

10          MR. BIEGENZAHN:  Thank you, Doctor Afra.

11          That's all I have, your Honor.

12          THE COURT:  All right.  Counsel, do you have any

13  redirect?

14          MR. REISS:  I only have two.

15          THE COURT:  Okay.  If you'd come to the podium,

16  please.

17                    REDIRECT EXAMINATION

18  BY MR. REISS:

19  Q    Doctor Afra, do you recall being present at the

20  courthouse in Santa Monica when the lis pendens that you had

21  on the property owned by Artek was stricken by the Court?

22  A    Yes.

23  Q    And at that time, was that the first time you ever saw

24  the letter from Mr. Namvar to Mr. Hakakian?

25  A    Yes.

50

1  Q    And was that part of Mr. Hakakian's declaration in

2  those proceedings?

3  A    Yes.

4          MR. REISS:  I have nothing further.

5          THE COURT:  Anything further, Mr. Biegenzahn?

6          MR. BIEGENZAHN:  Perhaps Mr. Reiss can fill this

7  in.  Do we have a time frame?

8          MR. REISS:  Very early on in the case, your Honor,

9  so --

10          THE COURT:  I remember there was a note in here

11  somewhere about that event.  I just don't remember when.

12          MR. BIEGENZAHN:  Well, there was a note, and there

13  are a lot of comments in the papers that aren't supported by

14  evidence, but my question is when did this take place?  Do

15  we know?

16          MR. REISS:  It took place probably December.

17          MR. BIEGENZAHN:  Of?

18          MR. REISS:  Of 2008.

19          MR. BIEGENZAHN:  And was an appeal taken?

20          MR. REISS:  No.

21          MR. BIEGENZAHN:  Thank you.

22          THE COURT:  Okay.  So that's the first time you

23  ever saw this note we're talking about?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  Thank you.  You may step down.

51

1 Watch the step there.  I don't want you to fall.

2          THE WITNESS:  Thank you, your Honor.

3          THE COURT:  And you can take your declaration with

4 you, please.

5          All right.  Mr. Biegenzahn, are you -- there's

6 nobody else to cross examine.

7          MR. BIEGENZAHN:  Mr. Reiss, is that the

8 Plaintiff's case?

9          MR. REISS:  That's the Plaintiff's case.

10          MR. BIEGENZAHN:  Very well.

11          THE COURT:  Okay.  Are you ready to cross examine?

12 I gather the only other person that's left would be Mr.

13 Namvar?

14          MR. REISS:  Yes.  Your Honor, at this time I'm

15 being joined at counsel table by Karen Afra.  She is an

16 attorney, and she is admitted to practice in the Federal

17 Courts.

18          THE COURT:  Okay.

19          MR. BIEGENZAHN:  No objection, your Honor.

20          THE COURT:  All right.  Counsel, if you'd come to

21 the podium.

22          Mr. Namvar, if you could walk around and be sworn.

23 And why don't you take a copy of your declaration with you

24 as well, Mr. Namvar, a copy of his declaration.

25          MR. BIEGENZAHN:  Your Honor, the copy that I have

52

1  is scribbled up by me.  I wouldn't think that should go into

2  the record.

3          THE COURT:  No, no, no.  Just for his convenience

4  like Doctor Afra had his copy.  I just wanted it so he would

5  -- no doubt he's going to be asked about his declaration.

6          MR. BIEGENZAHN:  But my assumption was Mr. Reiss

7  would bring the declaration he wanted to use to interrogate

8  the witness, just as I did.  Is that not correct?

9          THE COURT:  Well, the practice in this court and

10  every other federal court that I've been in is that each

11  side would present -- in this case it would be you -- copies

12  of the various exhibits, including declarations for the

13  judge, for you, for the other side as well as the witness.

14  I'm not going to belabor the point, but since it's your

15  witness, you should have brought it, but I'm not going to

16  belabor this because somebody -- I am sure that somebody's

17  going to -- I don't want people wandering up and back.  Do

18  you have a copy of his declaration?

19          MR. BIEGENZAHN:  I do not have a complete copy of

20  his declaration.  I have one that I used for trial

21  preparation.

22          THE COURT:  I assume, Mr. Reiss, you don't have an

23  extra copy?

24          MR. REISS:  I do not, your Honor.

25          THE COURT:  Well, we'll just have to do the best

53

1  we can.  Mr. Namvar, why don't you step forward and be

2  sworn, and we'll see what we can do.

3          Why don't you raise your right hand, please.

4          MR. BIEGENZAHN:  Your Honor, don't we have one in

5  the court file?

6          THE COURT:  That's mine.  Yes.

7          EZRI NAMVAR - DEFENDANT'S WITNESS - SWORN

8          THE COURT:  Please be seated.  Would you state

9  your full name and spell it, please.

10          THE WITNESS:  Ezri Namvar, E-Z-R-I N-A-M-V-A-R.

11          THE COURT:  All right.  In answer to your

12  question, yes, I have a copy, but that's my copy so I can

13  read it.  If need be, I'll give Mr. Namvar my copy, but --

14          MR. REISS:  It won't be necessary, your Honor.

15  This is going to be quite brief.

16          THE COURT:  Okay.

17                    CROSS EXAMINATION

18  BY MR. REISS:

19  Q    Mr. Namvar, is it accurate that Namco borrowed

20  $1,000,000 from Doctor Afra?

21  A    Yes.

22  Q    And you personally guaranteed that million dollars?

23  A    Correct.

24  Q    Has Namco paid any portion of the $1,000,000?

25  A    The principal, no.

54

1  Q    Has it paid interest since September of 2008?

2  A    I don't know, but I know it paid some interest.  I

3  don't know when it stopped.

4  Q    Has -- have you personally paid any of the principal to

5  Doctor Afra?

6  A    No.

7  Q    Have you personally paid any of the interest to Doctor

8  Afra?

9  A    No.

10 Q    At the time this loan was made, did you disclose to

11 Doctor Afra that the loan documents that you were giving him

12 as collateral security from Artek and the guarantees from

13 Mr. Hakakian did not represent money actually lent by Namco?

14 A    This was not the discussion.  The discussion was that

15 we had a valid security on a property in Hawthorn or Torres,

16 and I believe -- my entire meeting with Doctor Afra lasted

17 less than three minutes.  They came.  We -- I escorted them

18 to Hamid's office.  Doctor Afra is correct in -- in a few of

19 his statements, but he mischaracterizes the events of that

20 day if it was a Thursday.  I was very busy, as usual.  You

21 have seen me in my office -- he has seen me in my office.  I

22 was on two or three phone calls.  Sean walks him through,

23 him and Mr. Zaghi, and tells me they have money and they

24 want to buy some property or invest.  So I'm just going to

25 cut a lot of the questions and tell you my version.

55

1    They come there.  We give them two or three properties,

2 one of which was Value Village Apartment Buildings, to look

3 at.  Mr. Zaghi was anxious not to set his money idle, not to

4 have any proof, but I thought that they had just cashed in

5 on an investment from Emax or :EquiMax Mortgage on the other

6 side of the office and they wanted to invest the money.

7    So I said -- I said anything you want to buy takes 60

8 days, 30 days for due diligence.  You can't do it right

9 away.  I did not approach him.  I did not solicit him.  They

10 are the ones who said "Do you have anything that we can get

11 a good rate on?"  We offered them a couple of collateral,

12 the cleanest of which was Artek.

13 Q    You're saying "we."  Was this some sort of first choir,

14 they were standing next to each other and saying this

15 simultaneously?

16 A    No, no, no.

17 Q    Was it Zaghi who said this or --

18 A    No.

19 Q    -- Mr. Afra?

20 A    I was sitting in my office with --

21 Q    Would you answer the question, please?

22        THE COURT:  Rather than do a narrative, I think

23 it's probably better just to answer the question.

24        THE WITNESS:  Okay.

25 //

56

1  BY MR. REISS:

2  Q    Can we just go back to the questions that I need you to

3  answer, okay, Mr. Namvar?

4  A    Okay.

5  Q    Did you ever tell Doctor Afra that the note and the

6  deed of trust from Artek and the guarantee from Hakakian did

7  not represent a loan actually funded by Namco?

8  A    I did not, but it was a valid loan.

9  Q    You didn't?

10  A    I don't remember having that conversation, no.

11        THE COURT:  It's just a simple question.  I think

12  you've answered it.  The answer is, no, you never told them

13  that.

14  BY MR. REISS:

15  Q    Did you give them any explanation of the circumstances

16  that caused Artek and Hakakian to give you those loan

17  documents?

18  A    I don't recall that conversation.

19  Q    You do recall that it just didn't happen, don't you?

20  A    What did not happen?

21  Q    That conversation never happened.  You never told --

22        THE COURT:  Which conversation?

23  BY MR. REISS:

24  Q    There was never a conversation in which you told Doctor

25  Afra the circumstances under which Hakakian and Artek had

57

1  created those loan documents, correct?

2  A    That statement is correct.

3  Q    Would it be accurate based on your declaration that the

4  reason that they created those documents was that you were

5  in need of money?

6  A    Yes.

7  Q    And they created those documents to assist you in

8  getting money from other people?

9  A    Hakakian did, yes.

10  Q    And Hakakian did that at the time because there were

11  demands being made on Namco and on you as a guarantor to

12  return investor money and there wasn't enough cash, correct?

13  A    Not necessarily.  I wanted to build back up my

14  liquidity due to the bank, Security Pacific Bank.  People

15  were getting panicky in the community, which I have told you

16  before in an interview, in the deposition, and I wanted to

17  have enough equity.  That's why Hakakian came to help with

18  his brothers, which is about eight, 12 million dollars plus,

19  you know, he said if you want you can use this property also

20  to get additional money from people.

21  Q    Now, Security Pacific Bank was a separate entity,

22  correct?

23  A    Totally.

24  Q    Is that correct?

25  A    Totally, yes.

58

1  Q    And were people at Pacific -- who were depositors at

2  Security Pacific Bank getting panicky and taking their money

3  out?

4  A    No.

5  Q    Then what was the panic?

6  A    Security Pacific Bank got a cease and desist order in

7  the summer of '08 which was we just by luck happened to be

8  the first bank or the second bank to be examined under the

9  new policy of FDIC, which at that time -- and I didn't know

10 it -- to take over a lot of small banks or take them -- you

11 know, close them down.  The cease and desist order basically

12 gives you time -- in our case we could have had two years to

13 correct -- to take some corrective actions.

14         THE COURT:  What was your relationship to the

15 bank, Security Pacific Bank?

16         THE WITNESS:  I and my immediate family, my -- by

17 immediate means my wife and children, were the largest

18 shareholder, not the only ones.  I was the chairman of the

19 board and one vote.  It was a total independent board, not

20 even Persians except my brother Sean, seven people from the

21 old regime, but somebody -- there was a lot of jealousy in

22 our community.  Somebody -- you have to be a computer expert

23 and know what you're looking for --

24         THE COURT:  Well, let me stop you.  I think you've

25 answered the question a long time ago.  So, Mr. Reiss, why

59

1  don't you ask another question.

2  BY MR. REISS:

3  Q    Would it be accurate that by July of 2008 Namco was not

4  making any new loans, that is, it was not lending out new

5  money to people?

6  A    It was not lending out new loans such as the Artek, but

7  we had previous loan commitments on joint venture projects

8  and stuff that we were still funding.

9  Q    So you were still funding deals where Namco was an

10  owner?

11  A    No.  We were funding deals to joint venture projects

12  with different LLCs to third parties like -- let's say we

13  had committed to a $2,000,000 loan and the disbursed amount

14  was 1.4.  There was $600,000 remaining.  If they submitted

15  vouchers for ongoing construction or whatever the reason may

16  have been or taxes or licenses, we were funding those loans.

17  Q    And what was the source of the money that you were

18  using to fund those loans?

19  A    The same source that it's always been for 30 years,

20  either new money or pre-finance of projects or sale of

21  projects or repayment of old loans.  It all went to Namco.

22  Different sources.

23  Q    And so the liquidity that you were raising through the

24  Hakakian family, through all of the brothers --

25  A    Hakakian and others, yes.

60

1  Q    -- was being used to fund those commitments?

2  A    Among other things, yes.

3  Q    And without that money, you wouldn't have been able to

4  fund those commitments, would you?

5  A    I believe I would have.  I could have got the

6  $2,000,000 or even more on the Hakakian note from somebody

7  else.

8  Q    So --

9  A    That was an easy note to pledge, and if your client had

10 required estoppel certificate at that time, I am certain as

11 I sit here Hakakian would have signed the estoppel

12 certificate verifying that note and the deed of trust.

13 Q    So let me explore that then, Mr. Namvar.  All this talk

14 about due diligence from your counsel, had the due diligence

15 been conducted and an estoppel certificate been requested,

16 it's your testimony in this case that it would have produced

17 a signature from Mr. Hakakian saying it was a valid note?

18 A    Absolutely, at that time, yes.

19 Q    And when did Mr. Hakakian first disavow the note?

20 A    When we -- and by we I mean Namco.  When Namco -- there

21 was two stages.  After 30 years of perfect payment, there

22 was two stages of non-perfect conduct by Namco.  The first

23 stage was we reduced the interest rates to everybody across

24 the board, and either September or October, the checks were

25 either 50 percent of their normal amounts, and we wrote a

61

1 letter that we are having financial difficulty, and a month

2 or two months after that, we stopped paying totally.

3       Then Mr. Zaghi, who was Mr. Afra's partner and the co-

4 investor in this note, somehow without our knowledge,

5 without -- in fact, he hadn't talked to me at all.  He

6 talked to Sean, my brother, and he contacted Mr. Hakakian on

7 his own, and he said, "What is this?  We want to foreclose,"

8 and Hakakian started making very angry phone calls, you

9 know, "This is not friendship, this is not the way you pay

10 me back.  I give you -- you know, you need to take care of

11 this loan, and take care of them however you can.  I don't

12 want to be involved with this, and I don't want to be

13 responsible for this."

14      That's before the incident on October 29th.  This was a

15 few days, maybe a week or 10 days, maybe two weeks before he

16 started making angry phone calls.  He saw my brother,

17 Moussa, in the club and also talked to him very awfully.  He

18 became angry I would say early after mid October, when --

19 right after Zaghi had the talk with him.  I don't know

20 whether Mr. Afra even knew him or had a talk with him.  I

21 don't know.

22 Q    And did Mr. Hakakian tell you directly that he was

23 going to disavow the note because --

24 A    Absolutely.  He said exactly what the scenario was

25 going to be.

62

1  Q    What did he say it was going to be?

2  A    He said, "I'm going to deny it.  I'm going to say that

3  you gave me a loan.  You were supposed to fund this loan,

4  and you didn't.  And that's going to be my story.  You

5  better take care of your end with them.  This is not going

6  to be my responsibility," something to that effect.

7  Q    And you couldn't take care of the loan, could you?

8  A    No, I couldn't.  I was -- by that time I was -- I did

9  not have the -- I mean, the intention was to take care of

10 all the loans, but, unfortunately, the events happened too

11 fast.  We had a lot of properties in escrow.

12 Q    And, ultimately, on October 29th, you disavowed this

13 loan too and said "We never loaned him any money?"

14 A    I did not disavow the loan.  That's a very highly

15 technical and legal term.  The letter speaks for itself,

16 which is the truth, and it says no money has been funded on

17 this note.  It doesn't talk about disavowing or it doesn't

18 talk about invalidity.

19 Q    Why didn't you say in this letter "You gave it to me so

20 I could raise money from other people?"

21 A    I wish you were there on that day.  It wasn't -- you

22 know, and that was the day I hadn't started taking my pills

23 yet.  I was very panicked, and I was laying on the couch, I

24 remember, scared of my life.

25         MR. REISS:  I have nothing further at this time,

63

1    your Honor.  Thank you.

2          THE COURT:  Let me ask you about that.  You said

3    you were scared for your life.  Did he have any weapon with

4    him?

5          THE WITNESS:  No, but I'm sure you've seen him in

6    court.  I don't know if you remember him or not.  He is a

7    gentleman with big stature, and his wrath is very bad.  He

8    basically toppled -- his fists could have been a weapon.  He

9    -- if three people or four people hadn't held him, it would

10   have been a different story.  He toppled five cabinets that

11   three people can't do, big, big file cabinets.

12         THE COURT:  And he didn't tough you, though,

13   physically?

14         THE WITNESS:  He did not.

15         THE COURT:  And how long was this going on, this

16   argument with him?

17         THE WITNESS:  From the time he came to the office

18   and the time he left, it was over an hour, an hour and a

19   half because we called security.  The security took about 10

20   to 15 minutes to come, and then my brothers called --

21         THE COURT:  Okay.  So let me stop you then.  So

22   about 10 minutes into this, security came?

23         THE WITNESS:  Fifteen minutes, yes.

24         THE COURT:  Okay.  And did they escort him out of

25   the building?

64

 1          THE WITNESS:  No.

 2          THE COURT:  Why not?

 3          THE WITNESS:  Because my brothers wouldn't let

 4  him.  The Persian culture, they came.  They gave me cold

 5  water.  They gave him cold water, sit down, blah, blah, and

 6  the security just stood in the lobby in case we need them

 7  again.

 8          THE COURT:  Okay.  So -- and I gather this

 9  statement you typed up, did you type it up yourself or who

10  typed it up?

11          THE WITNESS:  Which -- Afshin Hakim in our office,

12  who was our junior lawyer, in-house lawyer.  He had a

13  handwritten letter which was obviously to me dictated by one

14  of his lawyers.  It was over a page and a half.

15          THE COURT:  Okay.

16          THE WITNESS:  And we reduced it to this because I

17  was very careful that --

18          THE COURT:  And who physically typed this?

19          THE WITNESS:  I think Afshin Hakim on his

20  computer.  I know that was the case.

21          THE COURT:  And he has a computer in your office?

22          THE WITNESS:  He has -- he is still working for

23  Namco.  I'm not there, of course, as you know.

24          THE COURT:  How many people were in the office

25  when you signed this?  Security's outside I gather.

65

1          THE WITNESS:  Well, at least -- how many -- can I

2    answer the --

3          THE COURT:  Please, that's one of the things --

4          THE WITNESS:  In the whole office --

5          THE COURT:  No, I'm not talking about the whole

6    office.  I'm talking about in your -- when I mean the

7    office, I mean your room, not the --

8          THE WITNESS:  How many people were present at the

9    signing of this?

10          THE COURT:  Yeah.  How big is your room, your

11    office?  When I say office, I mean your office, not your

12    secretary's office, not somebody else, the room where you

13    had your desk, about how big?

14          THE WITNESS:  About -- from that --

15          THE COURT:  And I'm asking --

16          THE WITNESS:  From here to here, but about three-

17    quarters of --

18          THE COURT:  Okay.  But I'm gathering because you

19    are obviously pretty well to do, this is probably not a tiny

20    little office.

21          THE WITNESS:  No, no.  It was --

22          THE COURT:  I've never been there, but I assume

23    given your stature at the time it would have been a big

24    office, right?

25          THE WITNESS:  It was the biggest office in the

66

1  suite.

2       THE COURT:  Okay.  Well, I would assume that.  How

3  many people were in the actual office, your office where

4  your desk is?

5       THE WITNESS:  About four or five.

6       THE COURT:  When this was signed?

7       THE WITNESS:  Yes.

8       THE COURT:  Okay.  So you obviously weren't

9  fearful of any physical harm coming to you, were you?

10      THE WITNESS:  Only if I hadn't signed it.  They

11  were there to protect me.  He was insisting that I sign

12  this.

13      THE COURT:  I understand that.  But at that time,

14  I mean, you got there and you got the security outside.  You

15  got a number of people.  He was no threat to you physically,

16  was he?

17      THE WITNESS:  Yes, he was.

18      THE COURT:  How is that possible?

19      THE WITNESS:  Because he took a stab to come and

20  hit me and break windows and stuff when --

21      THE COURT:  At the time this was signed, you had

22  you and there were other -- and there was him, and how many

23  other people in the room?

24      THE WITNESS:  And at the time we agreed to sign

25  it, between the time we agreed to sign it and the time I

67

1  signed it must have been half hour, 20 minutes.

2          THE COURT:  And, again, there were --

3          THE WITNESS:  Because we kept revising it.

4          THE COURT:  But the security was there.

5          THE WITNESS:  Security is like being on the other

6  side of -- our office was a very huge office.

7          THE COURT:  Right, and --

8          THE WITNESS:  Reception is many feet away.

9          THE COURT:  -- you say other people.  Who were the

10 other people in the office?

11         THE WITNESS:  Hamid Tabar was there.  I bring my

12 brother Moussa was there.  We are all very small compared to

13 him, and I was there and Afshin Hakim.

14         THE COURT:  Okay.  All right, Mr. Biegenzahn.

15                  REDIRECT EXAMINATION

16 BY MR. BIEGENZAHN:

17 Q    Mr. Namvar, first, the declaration that you submitted,

18 did you participate in the drafting of that declaration?

19 A    A lot more than you did, yeah.

20         THE COURT:  Who typed up the final version?

21         MR. BIEGENZAHN:  Objection, your Honor.

22 Argumentative.  No.  I typed up the final version.

23         THE COURT:  I mean, it was a rhetorical question,

24 but I just wanted to ask it.  Most -- in virtually every

25 case at the end of the day the attorney types it up and then

*Briggs Reporting Company, Inc.*

68

1  you look at it to see if you agree, right?

2          THE WITNESS:  Well, but I made a lot of changes to

3  the first draft.

4          THE COURT:  Okay.

5          THE WITNESS:  Like I'm doing with other cases, and

6  in some cases, Judge, you will see that I am pro per because

7  I can't afford to pay Mr. Biegenzahn.

8          THE COURT:  Okay.

9  BY MR. BIEGENZAHN:

10  Q    Is it accurate to say that it took days to complete the

11  drafting process?

12  A    Yes.

13  Q    Is it accurate to say that you reviewed --

14          THE COURT:  Now you're talking about your

15  declaration?

16          MR. BIEGENZAHN:  His declaration, yes, your Honor.

17          THE COURT:  I mean his declaration.

18  BY MR. BIEGENZAHN:

19  Q    At least six versions?

20  A    Afra was about eight or nine versions because each time

21  I changed it, I called it Afra 1, Afra 2.  It's eight or

22  nine versions, yes.

23  Q    Now, your testimony today about Mr. Hakakian, were you

24  surprised at the position that he took?

25  A    I was very surprised.

69

1  Q    At any point in time before the incident that you've

2  described to Judge Russell, did he say to you "I no longer

3  want to help you" or "I'm not going to help you with this

4  collateral.  I'm going to, in essence, renounce it?"

5  A    Not only he said that, he turned exactly 180 degrees

6  and became from one of my best friends to one of my worst

7  enemies.

8  Q    And during your --

9  A    And everything else also.

10  Q    -- your colloquy with Judge Russell, he asked you if

11  you were fearful, physically fearful that he might harm you,

12  and I think your answer was yes.  Is that correct?

13  A    Yeah.  It wasn't only that time.  I was worried that he

14  would come to my house or he would do other things, the --

15  because it's not the point to say that the brothers, all of

16  them are known to be very violent.  Call them the Persian

17  Mafia.

18  Q    That's the Hakakian brothers?

19  A    Yes.  They're very known to have -- to have been like

20  this with other people, including New York, but I -- it's

21  not the context of this court hearing, and I don't want to

22  -- unless you want me to elaborate.

23        THE COURT:  But you just said he was one of your

24  best friends, though.

25        THE WITNESS:  He was one of my best friends.  This

70

1  is the kind of person you want as a friend.  No, no, but he

2  was --

3        THE COURT:  I don't know about that, but, okay,

4  maybe --

5        THE WITNESS:  No, no.  He was -- he was one of our

6  best friends.  We didn't do much business.  They had money

7  with me for years and years, him and his brothers.  He took

8  his money out.

9        THE COURT:  Okay.  Let me stop you.  Why -- what

10  was the reason -- when you signed this -- you're a pretty

11  smart guy.  You knew what was going to happen with this

12  letter, didn't you?

13        THE WITNESS:  No.

14        THE COURT:  You had no idea why he wanted this

15  letter?

16        THE WITNESS:  No.

17        THE COURT:  Then what --

18        THE WITNESS:  Let me --

19        THE COURT:  I find that hard to believe.

20        THE WITNESS:  Okay.  Let me tell you why.  You

21  have somebody who is very very panicked, and despite of all

22  the doctors' advice and stuff, I wasn't taking pills that

23  I'm taking now.  Otherwise, I couldn't sit here.

24        THE COURT:  That's a different question.  I'm

25  asking you what did you think he was going to do with this

71

1  letter?

2         THE WITNESS:  If you can, and I think this is

3  going to be -- he is rather -- he wanted to say to Zaghi and

4  Doctor Afra that he wasn't responsible for this money,

5  and --

6         THE COURT:  So you knew that the reason he wanted

7  this was so since you're not paying, that he would -- that

8  Doctor Afra would come after him -- to him, and he would use

9  this as a defense.  I mean, you knew that, right?

10         THE WITNESS:  Yeah.  But all we said in that

11  letter that it wasn't funded.  We didn't say it wasn't

12  valid, because that's all the other language he wanted,

13  because under my circumstances it was a true statement.  I

14  thought it was harmless to anybody, and I would be safe from

15  him harming me by saying -- all I say there is this -- there

16  was no money disbursed toward this note, which was the

17  truth.  He would have got that by deposition and anything

18  anyway.  He wanted a much stronger letter, and I didn't do

19  that.

20         THE COURT:  So no money was -- this $4.3 million

21  was never loaned, is that correct?

22         THE WITNESS:  It wasn't, and the evidence that he

23  put it as -- what my testimony says to raise money on it was

24  look at the loan docs.  I've never made a loan at eight

25  percent at no point, and, I mean, we borrowed at eight

72

1  percent.  So we made a loan to him at eight percent, no

2  points, no processing fee, basically nothing, no documents.

3           THE COURT:  You say you never made that loan?

4           THE WITNESS:  I never disbursed the money.

5           THE COURT:  Okay.

6           THE WITNESS:  I never gave him any money on that

7  loan, like I testified.

8           THE COURT:  So any security interest he would have

9  given you would be invalid because there's no -- there's no

10 debt?

11          THE WITNESS:  Not necessarily, your Honor.  If --

12 and I am not arguing with you, your Honor.

13          THE COURT:  Well, I want to know -- I mean, it's a

14 fairly basic principle that you need a debt to support a

15 security interest.  Where was the debt?

16          THE WITNESS:  And I see how you can see that.  If

17 you look --

18          THE COURT:  No, but that's what the law is.

19          THE WITNESS:  But, no.  It is the law, and it

20 depends on your interpretation, your Honor.  If Hakakian --

21 if my testimony is correct and Hakakian said I would have

22 given you more money if I had, they just finished paying

23 $12,000,000 from his brother, but if you want more money, I

24 have a free and clear property.  Why don't you put a lien on

25 this and go pledge it and get whatever money you need?  I

73

1  was conscious --

2  THE COURT:  Let me stop you.  I know you said that

3  in your declaration, but I can't follow what at all that has

4  to do with this.  It's a pretty simple principle.  I think

5  you know exactly what I'm saying.  For the security interest

6  he gave you, the trust deed, to be valid, there has to be a

7  debt to support it, correct?

8  THE WITNESS:  Not necessarily.

9  THE COURT:  How is that --

10  THE WITNESS:  Because in my 30 years of business,

11  guaranteed deeds are given a lot of times without money

12  changing hands.  Deeds of trust are given for bonds.  Deeds

13  of trust are given for family members to raise money on

14  including my sisters and brothers.

15  THE COURT:  Let me stop you.  But at the end of

16  the day, you are aware -- I mean, you -- I'm just the judge

17  here.  You actually do a lot of transactions.  You know that

18  in order to have a trust deed to be valid you need a debt to

19  support it.

20  THE WITNESS:  There was a debt.  His debt to me --

21  his debt to me was rather than giving me cash -- let's just

22  say that he was --

23  THE COURT:  Let me stop you.  So there was no --

24  there was never any $4.3 million given to him for this --

25  for the security interest, correct?

74

1        THE WITNESS:  There wasn't.

2        THE COURT:  Okay.  Didn't you think that Doctor

3  Afra might have wanted to know that?  Because the papers --

4  the documents that he was given said there's a $4.3 million

5  note.  Don't you think he would have wanted to know that

6  that note was really never funded?

7        THE WITNESS:  I gave him -- I took him to Hamid's

8  office and told him given every document --

9        THE COURT:  No, no.  You're not answering my

10  question.  My question is a very simple question.  Don't you

11  think he would have wanted to know that you never -- that

12  note was never funded?

13        THE WITNESS:  He would have wanted to know whether

14  this loan was totally valid or not.  In my mind, it was

15  valid.

16        THE COURT:  You're really not answering my

17  question.  It's a really simple question.  Did you not think

18  that he would want to know that that $4.3 million note was

19  not funded, yes or no?  Do you think he'd want --

20        THE WITNESS:  I don't know.  I really don't know

21  at that time.

22        THE COURT:  Okay.  All right.  You've answered my

23  question.

24        Mr. Biegenzahn?

25        MR. BIEGENZAHN:  Yes, your Honor.

75

1  BY MR. BIEGENZAHN:

2  Q    Mr. Namvar, in your testimony you said -- and I'm going

3  to do my best to quote you -- "We gave them two or three

4  choices I thought," and I wasn't sure if it was collateral

5  or purchase choices, and you included Valley Village as one

6  of the three.

7  A    Yes.

8  Q    Would you explain that for me a little bit?

9  A    Valley Village is for the purpose of purchase.  It

10  wasn't for the purpose of collateral.

11  Q    And were they not interested in purchasing Valley

12  Village?

13  A    No, no, they were.  Mr. Zaghi made me a very liberal

14  offer, and we ended up selling it through the Trustee, Mr.

15  Bradshaw for $1,000,000 more than his offer.  His offer

16  wasn't adequate enough, and we also gave him a piece of the

17  Wilshire Bundy as collateral.  We suggested they could take

18  collateral on Wilshire Bundy.  They didn't want to -- they

19  wanted something very straight, like the -- and they finally

20  chose to take the Artek note.

21      I -- as I sit here, I believe Hamid might have told

22  them the whole arrangement that we had with Hakakian.  It

23  wasn't us trying to hide anything from anybody.

24  Q    Whose idea was the --

25          MR. REISS:  Motion to strike that last piece of

76

1    testimony as hearsay, speculation.

2            THE COURT:  No, I'll allow it.

3    BY MR. BIEGENZAHN:

4    Q    Whose idea was the Artek transaction?

5    A    It started with Hakakian.

6    Q    You testified that at the time of Doctor Afra's loan

7    that you are certain Alex Hakakian would have signed an

8    estoppel certificate for Artek?

9    A    Absolutely.

10   Q    And what would --

11           THE COURT:  You understand that's pure

12   speculation, but -- I'll leave it, but he has no way of

13   knowing what he would or would not have signed.

14   BY MR. BIEGENZAHN:

15   Q    Assuming that had taken place, what would have been the

16   effect, if you know?

17           MR. REISS:  Objection.  Calls for a legal

18   conclusion.  Calls for speculation.

19           THE COURT:  Right.  No, I agree.  I'm going to

20   sustain those objections.  You're dealing with events that

21   simply didn't happen, and I have no idea whether or not he

22   would have signed that.  So, no, I'm going to sustain the

23   objection.

24   BY MR. BIEGENZAHN:

25   Q    At the time you executed the collateral assignment of

77

1  the Artek note on behalf of Namco, did you believe that the

2  assignment was enforceable?

3  A    Yes.

4  Q    What is your belief about the enforceability of the

5  assignment now?

6  A    I still believe based on my testimony and all the other

7  testimony that's coming out in the State Court through my

8  brothers and Hamid and others, it would be enforceable

9  because Hakakian exactly agreed -- I mean, my version of the

10 events is exactly what happened, and I believe it would be

11 enforceable.  The fact that money has been disbursed or not,

12 I don't want to argue with the judge, but consideration

13 comes in many ways the way I have been taught and brought up

14 and it's not necessarily money.  Considerations are many

15 ways.  There's case laws in the State Court.  And, again, I

16 don't want to be argumentative.  I believe that they should

17 prevail in the State Court.

18         MR. BIEGENZAHN:  Thank you.  I have no further --

19         THE COURT:  I have one quick question.  Not to

20 belabor the point, Mr. Namvar, but this note that you

21 signed, was it the 29th -- not the note.  I mean the

22 declaration, so you're saying it's accurate?

23         THE WITNESS:  That is accurate.

24         THE COURT:  Well, if it's accurate, why did you go

25 through all this effort to make it look like it was forged

78

1 if it was accurate?  What --

2           THE WITNESS:  No, no, no, because I --

3           THE COURT:  You're saying it's accurate, right?

4           THE WITNESS:  Right.

5           THE COURT:  Well, then what difference does it

6 make that he came and he --

7           THE WITNESS:  No.  I -- I was hoping that he does

8 the same thing and gets the same result by deposing me.

9           THE COURT:  Let me stop you.  I'm asking you a

10 very simple question.  You say it was accurate?

11           THE WITNESS:  Yes.

12           THE COURT:  But I got the strong impression at

13 least that you described in coming in and all this, threats

14 and all, that it wasn't accurate, but if it's accurate, why

15 did you go through all the effort to talk about him coming

16 in and threatening you and all that?  Why did you do --

17           THE WITNESS:  Why I did it?  Because this is what

18 he did.  I didn't want to sign the note.

19           THE COURT:  No, I understand that.  I know --

20           THE WITNESS:  I did not want to --

21           THE COURT:  But it was truthful, right?

22           THE WITNESS:  It was truthful, but that's half of

23 what the answer should be.  Can I say the other half or no?

24           THE COURT:  No.

25           THE WITNESS:  Okay.

1          THE COURT:  I get to ask the questions.  Your

2   attorney and the other attorney get to ask the questions.

3   I'm just thinking of why you went through all the effort.

4   But it was accurate, right?

5          THE WITNESS:  Well, no money was disbursed.

6   That's the only point you were trying to make, but I was

7   hoping to do it in a deposition setting so Mr. Saris can

8   also ask his questions.

9          THE COURT:  Okay.  You've answered my question.

10         Any further questions from either side?

11         MR. REISS:  I just have one if I might, your

12   Honor.

13         THE COURT:  All right.

14             FURTHER REDIRECT EXAMINATION

15   BY MR. REISS:

16   Q   Mr. Namvar, if you had been in Doctor Afra's place in

17   the negotiations with you over this transaction, with your

18   experience, your knowledge, your skill, your training, would

19   you have wanted to know the circumstances under which the

20   Artek note was created?

21         MR. BIEGENZAHN:  Objection, your Honor.

22   Competence.  He can't possibly know.

23         THE COURT:  No, that's overruled.

24         THE WITNESS:  No, no.  I -- I wouldn't think of it

25   that way.  Every time we collateralize a loan as a lender,

80

1  we ask for estoppel certificate, all sorts of things.

2  BY MR. REISS:

3  Q    So you would have wanted to --

4  A    As a lender, I would have done that, yes.

5         MR. REISS:  Thank you.  Nothing further.

6         THE COURT:  Okay.  Thank you.  You may step down.

7  Again, watch your step there.  There's a step people miss

8  sometimes.

9         All right.  Anything else?

10        MR. BIEGENZAHN:  Your Honor, can we take a brief

11 recess?  Mr. Reiss and I, without trying to be too

12 disruptive, talked about whether we should call Mr. Newfeld

13 and Mr. Hakim --

14        THE COURT:  Well, we're far -- as far as I'm

15 concerned, we're done unless there are witnesses here.

16        MR. BIEGENZAHN:  That's fine, your Honor.

17        THE COURT:  It's 20 to 12:00 and --

18        MR. BIEGENZAHN:  That's fine, your Honor.

19        MR. REISS:  That's fine.

20        THE COURT:  And, I'm -- quite frankly, it doesn't

21 matter anyway.  Their testimony -- they were sort of outside

22 listening to the destruction, and he said it was true

23 anyway.  So I'm not quite sure what possible relevance -- I

24 thought the testimony would be different.

25        Okay.  Mr. Biegenzahn, both sides rest?

81

1          MR. REISS:  Yes, your Honor.

2          MR. BIEGENZAHN:  Yes, your Honor.

3          THE COURT:  All right.  Mr. Biegenzahn -- I'm

4 sorry.  Mr. Reiss, you're the movant.

5          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

6          MR. REISS:  I'm fortunate in this court in terms

7 of closing argument because I know your Honor studies the

8 trial briefs.

9          THE COURT:  Well, plus I was here.  So I've read

10 the testimony.

11          MR. REISS:  So there's really not a lot to say.

12          THE COURT:  No, I've read everything twice.

13          MR. REISS:  This was a fraud from the outset  This

14 was a set of documents created for no other purpose than to

15 defraud, and it was created in order to create -- I think

16 they used to call it in the Nixon years plausible

17 deniability.  Everybody had an out.  This -- this was -- the

18 only -- the only guy that had a front door here was Afra,

19 and he walked into the front door with $1,000,000.

20 Everybody else had a back door.  Everybody else had a way to

21 get out, and they all used them, whether it was voluntary

22 bankruptcy, involuntary bankruptcy, or denying the validity

23 of the note.

24          That -- there could have been nothing more

25 material to this transaction than the validity of that

82

1  security and the circumstances under which it was created,

2  and that was concealed, and it was concealed intentionally.

3  And, actually, if we were to listen to the tape, Doctor Afra

4  said something -- and I have a good memory for transcript.

5  He said "He told me he had loaned $4,000,000 to Artek."  And

6  he did, and there's no denial of that, not anywhere, because

7  that's how this security is presented.  This wasn't some

8  hybrid.  This wasn't some complicated Lehman Brothers

9  transaction.  This was a note, and if you didn't have a note

10  and security interest and had made a loan on this property,

11  you didn't, as Doctor Afra testified, give them the address

12  and the Google map and tell them to go there.  And that's

13  what happened.

14          This is a fraud from the beginning, and I believe

15  it meets all of the criteria for non-dischargeable debt.

16          Thank you, your Honor.

17          THE COURT:  Mr. Biegenzahn?

18          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

19          MR. BIEGENZAHN:  Yes.  Your Honor, I am absolutely

20  astonished that Mr. Reiss would say he remembered something

21  from the testimony that I never heard and then go on to say

22  it hasn't been denied.  It has been denied.  I challenge him

23  to find me --

24          THE COURT:  What has been denied?

25          MR. BIEGENZAHN:  That Mr. Namvar told Doctor Afra

83

1  that he had -- he or Namco had loaned $4,000,000 to Artek.

2  He didn't say that.  He didn't testify that he said that.

3  It's not in his declaration.  It's not in Doctor Afra's

4  declaration.  It is only in Mr. Reiss' mind.

5          Now, these documents were, I quote, "Created to

6  commit a fraud," but that's not the case, at least not the

7  case from the vantage point of the Defendant.  The concept

8  was Mr. Hakakian's.  It was his idea.  Maybe Mr. Hakakian

9  defrauded Namco.  Maybe he defrauded Doctor Afra.  Maybe he

10 had the concept throughout, but the case law says that in

11 order to prevail under Section 523 the Plaintiff must prove

12 that the Debtor/Defendant intentionally misrepresented

13 facts, that his intent was manifest from the very outset of

14 the transaction, not some later date but the outset of the

15 transaction and that the misrepresentation was the proximate

16 cause of the damage sustained by the Plaintiff.

17         Not the case here, your Honor.  Mr. Namvar has

18 testified.  He's testified in writing, a writing that he

19 concedes he helped create, not a lawyer-drafted document,

20 not something that was stuck in front of him to enhance his

21 prospects of success, something that he went over and over

22 and over.  It is truly his testimony, in contrast with the

23 Plaintiff's, of course.

24         Mr. Namvar has testified in court and on paper

25 that at the time of the transaction with Doctor Afra he

84

1  believed that the Artek obligation, the promissory note, and

2  the guarantee of that note by Mr. Hakakian were enforceable.

3  Mr. Namvar made a distinction which I think is significant,

4  and that is that a deed of trust and its enforceability can

5  be supported by consideration.  Yes, money could be

6  consideration, but it is not the only consideration.  And he

7  testified -- and he could be wrong.  He could have been

8  wrong then as a matter of law.  He could be wrong today as a

9  matter of law, but that's not what the statute tests.  The

10  statute tests subjective intent from the inception of the

11  transaction through the process to the point of harm to the

12  Plaintiff.  And, again, there must be a proximate link

13  between the misrepresentation and the harm.

14       There's no doubt that Doctor Afra has been harmed

15  here, but the proximate cause for that was the actions taken

16  by Alex Hakakian on his own behalf and on behalf of Artek.

17  He undid the deal that he had conceived, and that, your

18  Honor, was the cause of Doctor Afra's harm.

19       THE COURT:  All right.  Mr. Reiss?

20       CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

21       MR. REISS:  Counsel for the Debtor wishes to

22  create too narrow a definition of fraud under the statute,

23  and it is not subjective belief.  523 does not provide a

24  safe harbor for sociopaths who always --

25       THE COURT:  Well, look, you've -- your language is

85

1 a little strong, but it is true the intent is -- if I --

2 that you can never have a summary judgment, for instance, on

3 something which involves intent.  So, yes, a person -- if I

4 believe that that was the actual intent, no intent to

5 defraud, then I could rule in favor of the Defendant.  So

6 that is subjective.  That element is subjective.

7        MR. REISS:  But to state it so broadly as to say

8 as long as I believe I had a right to rob this bank, I'm

9 okay --

10        THE COURT:  Well, it has to be, of course, a

11 reasonable belief.

12        MR. REISS:  That's right.  And the law of fraud

13 also deals with reckless disregard of truth, and it also

14 deals with failing to disclose a material fact which if

15 known to the other party would have caused that party to act

16 differently, and we have all of those elements here.  This

17 is a total reckless disregard of the enforceability or non-

18 enforceability of these documents followed up by a

19 confirmation that they are not enforceable, and that is

20 clear evidence of the knowledge of the key element, and your

21 Honor pointed it out correctly, that underlying that note

22 there had to be a debt, and that -- that's why Hakakian

23 settled for the letter, and that's why Mr. Namvar gave it to

24 him, and that has been used as a club.

25        Now, it may be that in the State Court we can

86

1  prevail on fraud theories, on estoppel theories for having

2  allowed these documents to have been created in the first

3  place, but in terms of the validity of those documents ab

4  initio, Mr. Namvar knew what they were, and he concealed it,

5  and he concealed it because -- and the evidence is now clear

6  -- he was desperate for the money.  I was pleasantly

7  surprised and I will say that I nod and tip my hat to Mr.

8  Namvar for his candor and truthfulness in his declaration

9  because he makes it clear that there was desperation.  There

10 was a run on the bank.  He was raising millions of dollars,

11 and clearly there was a motivation for Mr. Hakakian to do

12 what he did to save his brother's investments, but that had

13 nothing to do with what was done to Doctor Afra and to

14 Doctor Zaghi, and that was to give them false documents,

15 knowing they were false, representing them to be something

16 that they were not, which were ordinary course of business

17 loans, and then taking $1,000,000.

18         Thank you.

19         THE COURT:  All right.  Thank you very much.

20         This was a -- I'm going to rule in favor of the

21 Plaintiff.  This case, as it turned out, it's amazing

22 actually to hear all this.  I think it's sort of a -- as I

23 said, I don't understand at all other than it was a

24 diversion, all this testimony about coming in and things

25 being toppled over when at the end of the day the statement

87

1  was accurate.  This is a clear case of fraud.  It's just --

2  I wasn't sure exactly how this was going to come out until I

3  heard the testimony, but it's basically admitted -- not

4  admitted that there was fraud, but the basic facts are

5  admitted by Mr. Namvar.  It's clear this is a -- and from

6  the standpoint of Doctor Afra, it's a very simple

7  transaction.  He wants to -- it's a loan of $1,000,000 and

8  temporary, for a short period of time at eight percent and

9  he got a note and a trust deed basically, period, and to say

10  that it's a defense, to say, well, we have other theories of

11  how it might be otherwise enforceable, clearly, the note was

12  -- it was never funded, and clearly there's a material fact

13  that clearly -- I can't imagine -- in fact, the testimony is

14  that Doctor Afra, if he had known the facts, would never --

15  knowing that that note represented something that never

16  actually occurred, it was never funded, would never -- and

17  he's testified to that in his -- he would never -- it would

18  be an absurd thing for anybody to do.

19          And so I'm -- and Mr. Namvar knew that.  And so

20  this is a -- it's a shame.  I don't -- it's certainly not

21  something that I enjoy doing, but that's just part of my

22  job.  This is a clear case of fraud.  Mr. Namvar knew the

23  facts were material and basically by handing the documents

24  misrepresented the actual facts, clear case of fraud.  All

25  the elements are there.  Certainly this was an intent.  I

88

1  think Mr. Namvar is quite experienced in these matters, knew

2  very well what he was doing and knew very well what Doctor

3  Afra was doing and knew the facts were not as represented.

4  And, of course, all the other elements are there.  There was

5  a reasonable reliance on the documents, went out to look at

6  the property.  I can't imagine anybody in this situation

7  after they started taking depositions of people to find out

8  whether or not there was really a valid note -- so, in any

9  case, I don't want to belabor the point, but this is just an

10 absolute clear case of fraud, and I would like you if you

11 would prepare findings of fact, conclusions of law and a

12 judgment.

13         Now, the one thing that I understand in this case,

14 it's only sort of a comment, of course, Doctor Afra is suing

15 in the State Court.  There's no guarantee even if he wins

16 here, which he did, that he's ever going to get paid from

17 it.  He does have a note and trust deed.  So I don't see any

18 inconsistencies at all.  You're kind of caught in the

19 middle.  You're out in no man's land.  So who knows what

20 will happen in the State Court, but that's not for me to

21 decide.  All I can decide is what happens in this Court.

22 Obviously, Doctor Afra can't collect twice, but that's a

23 different -- that's a question way down the line that may

24 never come to pass.  So if you'd prepare an order, I would

25 sign it.

*Briggs Reporting Company, Inc.*

89

1        MR. REISS:  Yes, your Honor.

2        THE COURT:  Thank you very much.

3        ALL:  Thank you, your Honor.

4    (Proceedings concluded.)

5

6        I certify that the foregoing is a correct

7   transcript from the electronic sound recording of the

8   proceedings in the above-entitled matter.

9

10  /s/ Holly Martens                 11-18-10
    Transcriber                       Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*